# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

COURTNEY SAUNDERS,

          Plaintiff,

vs.

KYLE THIES, CLINT DEE, DANA
WINGERT, and the CITY OF DES MOINES,
IOWA,

          Defendants.

No. 4:19-cv-00191-JAJ-HCA

**OPINION AND ORDER
REGARDING DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT and PLAINTIFF'S
MOTION TO CERTIFY QUESTIONS**

_____

In this case, an African-American man asserts eleven civil rights claims under the United States and Iowa Constitutions against two white police officers, who were involved in giving him a traffic citation, the chief of police, and the city that employed them. This case is before the court on the April 7, 2020, Motion For Summary Judgment [Dkt. No. 17] by one police officer, the chief of police, and the city (the City Defendants), and the separate April 20, 2020, Motion For Summary Judgment [Dkt. No. 22] by the other police officer. Each Motion seeks summary judgment on all the plaintiff's claims against the pertinent defendants. The plaintiff filed a Resistance To Defendants' Motion[s] For Summary Judgment [Dkt. No. 33] on May 14, 2020. The City Defendants and the other police officer filed separate Replies [Dkt. Nos. 34 and 35] on May 21, 2020. For the reasons stated below, both Motions For Summary Judgment are **GRANTED in part and DENIED in part**.

This case is also before the court on the plaintiff's June 30, 2020, Motion To Certify Question[s] To Iowa Supreme Court [Dkt. No. 37], asking the court to certify two questions concerning an equal protection claim pursuant to the Iowa Constitution to the Iowa Supreme Court. The City Defendants filed their Resistance [Dkt. No. 38] on July 10, 2020,

and the other police officer filed his Resistance [Dkt. No. 39] on July 14, 2020. The plaintiff then filed his Reply [Dkt. No. 40] on July 15, 2020. For the reasons stated below, the plaintiff's Motion To Certify Questions is **DENIED**.

## I.    INTRODUCTION

### A.    *Factual Background*

Unless otherwise indicated, the facts stated, here, are undisputed, although the court has not included all the facts, disputed or undisputed, found in the parties' factual statements.[1] The court has also, at times, recast the parties' statements of facts to present them to the extent they are undisputed. In addition, there is body camera video and dash camera video of the plaintiff's interaction with the two police officers. The court has used the videos only to clarify the sequence of events set out in the parties' statements of facts, but not to add any facts, to avoid making any improper findings of fact on motions for summary judgment.

### 1.    *The parties*

Plaintiff Courtney Saunders is a 29-year-old African-American man with long, dreadlocked hair. He is a resident of Des Moines, Iowa. Saunders holds a valid gun permit and has no criminal history outside of traffic violations and a dismissed charge for possession of a controlled substance. The record does not reflect whether either of the police officers involved in the pertinent incident knew Saunders's criminal history at the time of the incident. The defendants are Des Moines Police Department Senior Police Officer Kyle Thies and Senior Police Officer Clint Dee, both white; Dana Wingert, the Chief of Police for the City of Des Moines; and the City of Des Moines itself. The court will describe defendants Dee, Wingert, and the City of Des Moines as the City Defendants.

---

[1] In support of his Motion For Summary Judgment, the individual officer adopts the statement of facts by the City Defendants in support of their Motion For Summary Judgment.

## 2.      *The incident*

Saunders's claims at issue in this lawsuit arise from an incident early in the morning of July 8, 2018, but the pertinent background begins the previous evening. Late in the evening on July 7, 2018, Saunders was watching television at his home when he received a call from a relative asking him to pick up his niece. His niece, who had turned six years old about three months earlier, had been staying with Saunders's sister, but she wanted to go home to her father, Cortez, who is Saunders's brother. Accordingly, at approximately 11:20 p.m., Saunders traveled in his fiancée's car to retrieve his niece from his sister's house in southeast Des Moines near the Southridge Mall. He then drove toward his brother's house, located near 20th and Mondamin Avenue, with the child in the backseat.

In the early morning hours of July 8, 2018, Thies was driving a police transport van with Dee in the passenger seat. The police van is primarily used to transport individuals to the Polk County Jail, but when not transporting prisoners, Thies and Dee operate as police officers, including investigating and making traffic stops from time-to-time. At approximately 12:53 a.m., Thies observed Saunders make a turn from 19th Avenue onto Martin Luther King, Jr., Parkway, and Thies began to follow him. Thies later testified that he began following Saunders because the way Saunders turned "didn't feel right." The defendants describe Saunders's turn as "abrupt," but they admit Saunders's allegation that the turn was "at a safe, normal speed" from the correct lane. Saunders states that the transport vehicle "abruptly" braked in order to cross the left-hand lane of traffic and follow him through his turn, which the City Defendants admit. Thies denies that his turn was "abrupt," but he admits that he did not plan to make the turn.

As the van continued to follow Saunders, Saunders turned right onto Mondamin. He pulled over and came to a stop near his brother's residence at the intersection of Mondamin and 20th Place. Saunders stopped his car directly across from a fire hydrant, behind a truck that was also parked in the "no parking" zone. Thies parked the police van in the middle of the street a few car lengths behind Saunders's vehicle. The officers never

turned on their flashing lights, emergency lights, or sirens to indicate any intent to take some action regarding Saunders. At no point before Saunders pulled in next to the fire hydrant did the officers give any express indication that they wanted him to stop. Saunders was aware the police transport van had been following him, however, and he contends that the officers' actions would have indicated to a reasonable person that they intended to make contact with him.

Thies and Dee exited the police van and approached Saunders's car. As they exited the van, Thies told Dee that Saunders was "parked in front of the fire hydrant; that's against the law." Officer Thies testified that he approached Saunders's vehicle for the sole purpose of investigating him for parking by a fire hydrant, but the officers did not contact dispatch before exiting the vehicle. The parties dispute whether Saunders's vehicle was actually stopped within 5 feet of the fire hydrant, which is the distance that would have constituted a violation. The officers approached Saunders's vehicle with one on each side. Saunders contends that, as a practical matter, he was not able to drive away at that point, because of the positions of the officers and the van. By the time Thies reached Saunders's driver's side front window, Saunders was on a phone call with a family member.

When Thies reached Saunders's window, he did not alert Saunders that he was parked in front of a fire hydrant or ask him to move his vehicle. Instead, Thies's first question to Saunders was, "Are you home?" Saunders responded negatively and asked, "Is there a problem?" Thies then said, "Do you mean like, is anything wrong?" Saunders said he was picking somebody up. Thies said, "Oh, okay," and asked if whoever he was picking up was coming out. Thies then waited as Saunders continued speaking on his cell phone to someone. After approximately 15 seconds, Officer Thies heard a noise coming from the back seat and shined a flashlight into the backseat on the driver's side. Officer Thies observed a small child in the back seat who was not in a booster seat and a previously opened bottle of Hennessy cognac, which was closed at the time.

When Saunders again asked if there was a problem, Thies responded, "Well other than the fact that there's a kid in the backseat that probably should be in a booster seat that's not, and the open bottle of alcohol, and the fact that you're parked in front of a fire hydrant when you're not supposed to be."  Saunders said, "This ain't my car, it's my girlfriend's and that bottle's been in there."  When Thies reiterated that the child should be in a booster seat, Saunders said he was dropping the child off, not that he was picking someone up, adding it was an emergency.  Saunders again asked, "Is there a problem?" and Thies responded, "Yes, I just explained to you there are three different things that are wrong at this point . . . there's a child that's supposed to probably be in a booster seat that's not in a booster seat, there's an open bottle of liquor in the back seat of the car, and you're parked in front of . . . the fire hydrant."  Saunders agreed that there was an open bottle of Hennessy in the backseat of the car.

Thies then asked for Saunders's driver's license.  Thies explained to Saunders that he was "being stopped now."  Saunders asked, "For what?" and Thies reiterated, "You're parked in front of a fire hydrant, you have a child that should be in a booster seat that is not, and you have an open bottle of alcohol."  Saunders explained that he was parked in front of a family member's house.  Saunders added that he had an open case on file already over his treatment by other police officers.  Thies then repeated his request for Saunders's driver's license or "I.D."  Saunders pulled out his driver's license and his handgun permit and informed Thies that the handgun was in the car with him.

When Saunders handed Thies his firearm permit, Thies asked Saunders whether he had been drinking, which Saunders denied.  Thies asks Saunders to step out to the back of the car, stating that he was not saying that Saunders was doing anything wrong, emphasizing that he would not be placing Saunders in handcuffs, and that Saunders "[wa]s not in any trouble."  Thies stated, however, that Saunders was detained at this point for the three things he had listed previously, that is, that Saunders's car was "sitting right in front of the fire hydrant, a child that should be in a booster seat, and the open bottle of alcohol

that's in the back." Thies informed Saunders that Saunders had also now "informed me that there's a gun under the seat and I'm not saying there's anything wrong with that because you're a valid permit holder," but that the officers wished to discuss with him further, with him outside the car, whether he had been drinking because of the open bottle. Thies added, "I don't want to do that when you're sitting on top of the gun." Saunders then got out of the car, and Thies patted him down, but Saunders was never handcuffed.

About the time Saunders got out of his car, the child's mother arrived and retrieved the girl from the back seat. Thies asked how old the child was, but Saunders responded that the child's age was irrelevant, because he picked up the child in an emergency. Thies asked, again, "So you haven't had anything to drink?" and Saunders responded that if Thies wanted to test him for intoxication to get testing equipment. Thies thought that a field sobriety test would be appropriate, based on Saunders's body language and Thies's belief that Saunders's eyes indicated he was impaired, possibly from something other than alcohol. The parties dispute whether Saunders's eyes were bloodshot and glossy. Dee did not see any evidence indicating Saunders was impaired. Thies went to the police van to perform checks on Saunders's license and for any outstanding warrants. Thies still did not contact dispatch to report a stop for any alleged violation. As Thies returned to the police van, Dee told Saunders, "Just relax man." Dee and Saunders did not speak otherwise during the period Thies was at the van; Saunders was on his phone most of this period.

When Thies tried to perform a field sobriety test, Saunders refused, stating, "I'd rather blow" meaning take a "Preliminary Breath Test" (PBT). Thies informed Saunders that the officers did not have a PBT machine with them, but Thies did not request that dispatch send a PBT at that time. Instead, Thies went to inspect the interior of Saunders's car. The parties' factual statements give no indication that Thies had requested or received Saunders's permission for a search of his vehicle. Thies retrieved the bottle of Hennessy from the floor of the rear passenger seat of the car, placed the bottle on the car roof, and took note of the handgun under the driver's seat. Next, Thies performed a general search

of the open areas of the car and dashboard compartments. While Thies was engaged in these activities, Saunders asked Officer Dee if he would get Dee's badge number as well. Dee said the officers would give Saunders their badge numbers.

Thies stopped his search of the car long enough to call dispatch for an officer with a functional PBT unit to report to the scene and to notify dispatch of a stop. He then continued a general search of the interior of the car, again looked at the handgun under the seat, but this time he asked dispatch to run the serial number of the handgun. Thies searched the car for signs of marijuana or liquor use, but he found no evidence for the former and no additional evidence for the latter. Thies returned to the police van and began preparing a citation for the open liquor container.

While Thies was doing so, Dee asked Saunders, "Do you have anything in your mouth?" Saunders replied, "Why would I have anything in my mouth" and then told Dee not to talk to him when Dee attempted to explain why he asked the question. Dee told Saunders he was talking about chewing gum or tobacco and not to jump to conclusions about why Dee was asking the question. Saunders then told Dee that he believed the reason he was pulled over was his race and that the officers would not have walked up to his car if he was a white person. Saunders then told Dee, again, not to talk to him.

A third officer arrived with a PBT unit, obtained Saunders's consent to a test, and performed the test. Saunders's PBT results indicated that he was not under the influence of alcohol. Saunders then asked Dee why the officers had walked up to his car. Dee replied, "Because you parked in front of a fire hydrant." Saunders and Dee discussed why the police van was behind Saunders's car before Saunders had stopped his vehicle. Dee provided no explanation besides saying that the officers were driving, just as Saunders was. Thies informed Saunders's mother, who had arrived on the scene with Saunders's brother, Cortez, that Saunders had an open bottle of liquor in the car. Thies got into a discussion with Cortez about whether the child needed to be in a booster seat. Cortez said he knew, for a fact, that the child did not need to be in a booster seat, because the child was seven—

although she was, in fact, six. Thies pointed out that he had gotten several different statements about the child's age, but that her age was irrelevant because he was not giving Saunders a citation for the child not being in a booster seat.

Thies gave Saunders a citation only for an open liquor bottle, and asked Saunders to sign it, adding that Saunders's signature was not an admission of guilt. Before the officers departed, Saunders wrote down Thies and Dee's badge numbers. Although Saunders signed the citation to acknowledge receipt, he informed Thies that he intended to plead not guilty to the citation. The officers then left in the van. Neither Thies nor Dee asked Saunders to move his vehicle before they left the scene, nor did either officer investigate or ticket any other vehicle improperly parked in the area.

### 3. Duration of the interaction

The parties agree that the body and dashboard cameras capturing the interaction demonstrate that from the time Officer Thies left the police van until the van departed was 22 minutes and 17 seconds; that from the time Officer Thies looked into the rear passenger compartment of the car to the time the police van left was 21 minutes and 25 seconds; that from the time Officer Thies informed Saunders he was "being stopped now" to the time the police van departed was 19 minutes and 48 seconds; that from the time that Saunders refused a field sobriety test and asked to "blow" until the PBT test was requested, in the wake of a search of Saunders's car, was 2 minutes and 29 seconds; that the call to dispatch for a PBT, which occurred 13 minutes into the interaction, was Thies's first radio notification to dispatch that a stop was in progress; that the officer with the PBT unit arrived more than 4 minutes and 30 seconds, after Thies requested his presence;[2] and that the third officer conducted the PBT almost immediately after he arrived.

---

[2] This time was determined from the difference between the times Dee's body camera and Thies's body camera were running. *See* Defs.' Stmt. of Facts [Dkt. No. 17-1], ¶¶ 99 (indicating a difference of 1 minute and 13 seconds to 1 minute and 23 seconds between the two officers' body camera videos for the same event). It was then determined from the parties' agreement on when

### 4.    Additional matters

In the case in state court arising from the open container citation, Saunders filed a motion to suppress.  The court held a joint trial and suppression hearing on December 5, 2018.  On March 21, 2019, the presiding magistrate judge filed a written ruling granting the motion and finding Saunders not guilty of the cited violation.  Pl.'s App. 3-7.  However, the parties dispute the relevance of any findings by the state court concerning the incident, including the constitutionality of the officers' actions.  The parties also dispute the relevance, as well as some of the details, of a handful of other "stops" by Thies or other Des Moines Police Officers, which Saunders has included in his statement of facts.

### B.    Procedural Background

Saunders filed his Petition[3] in this matter, asserting eleven civil rights claims, in the Iowa District Court for Polk County on June 3, 2019, naming the individual defendants in their individual and official capacities in the caption.   The first nine counts are against Thies and Dee, "individually."  The last two counts are against Wingert and the City.

More specifically, Count 1 is denominated "Unreasonable Search & Seizure:  Civil Rights Violation Under 42 U.S.C § 1983:  Violation Of 4th Amendment To The United States Constitution," and Count 2 is denominated "Unreasonable Search & Seizure:  Civil Rights Violation Of Article I, § 8 Of The Iowa Constitution."  The essence of these claims is that, "[o]n July 8, 2018, Defendants violated Mr. Saunders' clearly established federal constitutional rights [and Iowa constitutional rights, respectively,] by stopping

---

Thies requested an officer with a PBT, *see id.* at ¶ 79 (13:10 on Thies's body camera video), and when that officer arrived, *see id.* at ¶ 87 (16:42 on Dee's body camera video), by adding over one minute to the time shown on Dee's body camera to determine what time would have been shown on Thies's body camera for the arrival of the officer.

[3] The Petition [Dkt. No. 1-2] is attached to the Notice of Removal [Dkt. No. 1] filed by all defendants.

Mr. Saunders' vehicle; seizing Mr. Saunders; and searching Mr. Saunders and his vehicle without reasonable suspicion or probable cause to do so." Petition, ¶¶ 77, 84.

Count 3 is denominated "Unreasonable Extension Of Stop:  Civil Rights Violation Under 42 U.S.C § 1983:  Violation Of 4th Amendment To The United States Constitution," while Count 4 is denominated "Unreasonable Extension Of Stop:  Civil Rights Violation Of Article I, § 8 Of The Iowa Constitution."  The essence of these claims is that, "[o]n July 8, 2018, Defendants violated Mr. Saunders' clearly established federal constitutional rights [and state constitutional rights, respectively,] by extending the vehicle stop beyond what was reasonably necessary to resolve the basis for the stop." *Id*. at ¶¶ 92, 99.

Count 5 is an Iowa constitutional claim with no analogous federal claim, denominated "Pretextual Stop:  Civil Rights Violation Of Article I, § 8 Of The Iowa Constitution:  Right To Be Free From Unreasonable Searches & Seizures."  The essence of this claim is that, "[o]n July 8, 2018, Defendants violated Mr. Saunders' clearly established state constitutional rights by effectuating a pretextual warrantless automobile stop." *Id*. at ¶ 107.

Count 6 is denominated "Racially Biased Policing:  Civil Rights Violation Pursuant To 42 U.S.C. § 1983:  Violation Of 14th Amendment To The United States Constitution," while Count 7 is denominated "Racially Biased Policing:  Civil Rights Violation Of Article I, § 6 Of The Iowa Constitution."  The essence of these claims is that "[t]he actions and omissions of Defendants [as repleaded by reference] were undertaken with the intent to discriminate against Plaintiff on account of his race and the color of his skin, denying Plaintiff his Fourteenth Amendment right to equal protection under the law [and his Article I, § 6 right to equal protection under the law, respectively]" and that "Defendants singled Mr. Saunders out for harassment and treated him differently from other similarly situated persons." *Id*. at ¶¶ 115-16, 122-23.

Count 8 is denominated "Conspiracy:  Civil Rights Violation Pursuant To 42 U.S.C §§ 1983 And 1985:  Violation Of 4th, 5th & 14th Amendments To The United States

Constitution," while Count 9 is denominated "Conspiracy: Civil Rights Violation Of Article I, §§ 6 & 8 Of The Iowa Constitution." The essence of these claims is that "Defendants Thies and Dee reached an agreement among themselves to deprive Mr. Saunders of his [federal and Iowa] constitutional rights, [respectively]," and that, "[i]n furtherance of the conspiracy, each of the coconspirators committed overt acts and was an otherwise willful participant in joint activity." *Id.* at ¶¶ 130-31, 137-38.

The last two claims are against Wingert, "individually," and the City of Des Moines. More specifically, Count 10 is denominated "Deliberately Indifferent Policies, Practices, Customs, Training And Supervision: Civil Rights Violation Pursuant To 42 U.S.C § 1983: Violation Of 4th, 5th & 14th Amendments To The United States Constitution." The essence of this claim is that "Defendants violated Plaintiff's federal constitutional rights" in numerous ways;[4] that "Defendants' policies, procedures, customs, and/or practices

---

[4] The ways alleged are the following:

    a. permitting City of Des Moines police officers to violate the constitutional rights of citizens;

    b. ratifying and approving the unlawful stopping, seizure, detaining and searching of citizens;

    c. failing to enforce policies and implement policies preventing the unlawful stopping, seizure, detaining and searching of citizens;

    d. failing to properly review citizen complaints against City of Des Moines police officers;

    e. tolerating, encouraging, and permitting collusive statements by involved officers in such situations;

    f. failing to adopt and enforce policies to document citizen interactions that do not result in arrest or citation;

    g. failing to monitor and address racially-disproportionate actions taken by City of Des Moines police officers;

    h. failing to adopt a system to identify, track, and monitor problematic police behavior and patterns of unconstitutional conduct;

caused the violations of Plaintiff's constitutional and federal rights as set forth herein and in the other claims and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives"; and that "[t]he need for the aforementioned training and supervision was obvious and it was foreseeable that the inadequacy of Defendants' training and supervision was likely to result in the violation of constitutional rights." *Id*. at ¶¶ 148-50. This count alleges, further, that "Defendants demonstrated a deliberate indifference to and/or reckless disregard of Plaintiff's constitutional rights and those similarly situated to them" and that "Defendants failure to train and supervise Defendants Thies and Dee caused the violations of Plaintiff's constitutional and federal rights as set forth herein and in the other claims and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives." *Id*. at ¶¶ 151-52. Count 11 is an analogous state law claim denominated "Deliberately Indifferent Policies, Practices, Customs, Training And Supervision: Civil Rights Violation Pursuant To Article I, §§ 6 & 8 Of The Iowa Constitution." *See id.* at ¶¶ 159-62.

All defendants joined in removing this action to this federal court on June 26, 2019. The City Defendants filed their Answer on June 28, 2019, denying Saunders's claims and asserting various affirmative defenses, including that "[a]ll named Defendants have qualified immunity from suit as their actions were reasonable from their perspective at the

---

i.   failing to take adequate disciplinary measures against City of Des Moines police officers who violate the civil rights of citizens;

j.   failing to train and/or supervise properly Defendants Thies and Dee in the constitutional requirements for the stopping, seizing, detaining, and searching of citizens;

k.   failing to conduct sufficient training or supervision with respect to the rights of citizens to be free from race-based policing; and

l.   failing to implement adequate maintenance training and properly focused maintenance training.

Petition, ¶ 148.

time and/or in good faith" and that "[t]he Defendants are immune pursuant to Iowa Code Chapter 670." Thies filed his separate Answer on July 30, 2019, also denying Saunders's claims and asserting various affirmative defenses, including that "Officer Thies is immune for tort liability for all of Plaintiffs' claims based upon one or more subsections of Iowa Code § 670.4" and that he "is entitled to qualified immunity for all claims alleged against him."

Trial in this matter is set to begin October 5, 2020. The Motions now pending before the court followed in due course.

## II.     LEGAL ANALYSIS

It will be unnecessary for the court to reach Saunders's Motion To Certify Questions if the defendants are entitled to summary judgment on Count 7, which alleges an equal protection violation under the Iowa Constitution based on racially biased policing. Therefore, the court will consider the defendants' Motions For Summary Judgment, before the court considers Saunders's Motion To Certify Questions.

### A.     The Motions For Summary Judgment

The defendants' Motions For Summary Judgment have as a central theme that they have various kinds of immunity to Saunders's federal and Iowa constitutional claims. Therefore, the court will summarize, first, the standards for summary judgment, then the standards for immunity on which the defendants' Motions For Summary Judgment rely.

#### 1.     Applicable standards

##### a.     Summary judgment standards

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). It provides, further, that a "court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As the Eighth Circuit Court of Appeals recently explained,

> "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

*Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019).

More specifically, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 510 (8th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Once the parties have met their burdens, the court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Torgerson*, 643 F.3d at 1042-43 (internal quotation marks and citations omitted). Also, "'[w]here . . . the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861 (8th Cir. 2015) (quoting *In re Cochrane*, 124 F.3d 978, 981-82 (8th Cir. 1997)).

### b. Federal qualified immunity

Turning to the applicable immunity standards, as the Eighth Circuit Court of Appeals very recently reiterated, "Qualified immunity shields government actors from

legal liability unless the actor's conduct violated 'clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.'" *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020) (quoting *McGuire v. Cooper*, 952 F.3d 918, 922 (8th Cir. 2020)); *Ivey v. Audrain Cty., Missouri*, 968 F.3d 845, 848 (8th Cir. 2020) (same). When analyzing a qualified immunity defense, the court considers two questions: "[1] whether a defendant has violated a constitutional or statutory right and, if so, [2] whether that right was clearly established at the time of the defendant's conduct." *Ivey*, 968 F.3d at 849 (bracketed numerals inserted) (citing *Santiago v. Blair*, 707 F.3d 984, 989 (8th Cir. 2013)). If the answer to *both* questions is *yes*, then the individual defendants are *not* entitled to qualified immunity. *Vandevender v. Sass*, No. 19-1230, 2020 WL 4374977, at *1 (8th Cir. July 31, 2020). Courts "have the discretion to decide either question first." *Ivey*, 968 F.3d at 849.

As to the first prong, the "violation of a right" prong, the court "consider[s] whether a constitutional violation . . . in fact occurred." *Jackson v. Stair*, 944 F.3d 704, 710–11 (8th Cir. 2019). At summary judgment, the court "address[es] whether [the plaintiff] has presented evidence from which a reasonable jury could conclude that the Officers violated [the plaintiff's constitutional] right." *Lombardo v. City of St. Louis*, 956 F.3d 1009, 1013 (8th Cir. 2020). In doing so, courts "'must assess the actions of each officer from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.'" *Id*. (quoting *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017)).

As to the second prong of the qualified immunity analysis, the "clearly established right" prong, the Eighth Circuit Court of Appeals has explained,

> To be clearly established, the contours of the right must be clear enough that a reasonable officer would understand that the act in question violates the right. *Ehlers [v. City of Rapid City]*, 846 F.3d [1002,] 1008 [(8th Cir. 2017)]. Existing law need not be directly on point to clearly establish a right, but it

> must put the question beyond debate. *Jackson v. Stair,* 944
> F.3d 704, 711 (8th Cir. 2019).

*Kohorst*, 968 F.3d at 876; *Jackson*, 944 F.3d at 711 ("The relevant question is whether a reasonable officer would have fair warning that his conduct was unlawful."). Thus, "[t]he Supreme Court has cautioned courts not to define clearly established law at too high a level of generality." *Ivey*, 968 F.3d at 849 (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). Rather, "'[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established.'" *Goffin v. Ashcraft*, 957 F.3d 858, 861 (8th Cir. 2020) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). Consequently,

> [The plaintiff] must identify "either 'controlling authority' or 'a robust consensus of cases of persuasive authority' that 'placed the statutory or constitutional question beyond debate' at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (quoting *Ashcroft [v. al-Kidd]*, 563 U.S. [731,] 741-42, 131 S.Ct. 2074 [(2011)]. "A plaintiff's failure to identify a case where an officer acting under similar circumstances was held to have violated the [Constitution] is often fatal to a claim outside of obvious cases." *K. W. P. v. Kansas City Public Schools*, 931 F.3d 813, 828 (8th Cir. 2019) (cleaned up).

*Goffin*, 957 F.3d at 861–62.

One further point requires brief discussion. That point is the effect upon claims against the governmental subdivisions that employ officers of a determination that the individual officers have qualified immunity. As the Eighth Circuit Court of Appeals explained,

> The county maintains that we may resolve its appeal because our conclusion that the officers are entitled to qualified immunity means that the county cannot be liable. That would be correct if we had held that no constitutional violation occurred here. *See Mogard v. City of Milbank*, 932 F.3d 1184, 1192 (8th Cir. 2019). But that is not our holding. We hold only that the officers are immune from suit because they did not violate Ivey's clearly established rights. That does not mean that they did not violate the constitution, *see Webb v. City of*

> *Maplewood*, 889 F.3d 483, 487–88 (8th Cir. 2018), which
> would absolve the county from responsibility for their
> unconstitutional acts, if any. *See Mogard*, 932 F.3d at 1192.
> When the determination of the county's liability does not flow
> ineluctably from a resolution of the qualified-immunity issue,
> the question of whether it is liable for failing to train its officers
> is not inextricably intertwined with the matter of qualified
> immunity. *See Manning [v. Cotton]*, 862 F.3d [663,] 671 [(8th
> Cir. 2017)].

*Ivey*, 968 F.3d at 851. Thus, here, the City will escape liability based on the officers'
qualified immunity, only if the officers' qualified immunity is based on Saunders's failure
to generate a genuine issue of material fact on the first prong of the qualified immunity
analysis, considering whether there was a "violation of a right."

### c.  *Iowa qualified immunity*

Both Iowa constitutional torts and the standards for immunity to them are quite
newly minted. The Iowa Supreme Court "recognized that a direct cause of action for
damages resulting from an Iowa constitutional tort could be brought against the state and
state officials in their official capacities in the recent case of *Godfrey v. State*." *Baldwin v.
City of Estherville (Baldwin V)*, 929 N.W.2d 691, 696 (Iowa 2019) (citing *Godfrey v. State*,
898 N.W.2d 844, 847 (Iowa 2017)). Somewhat more specifically, "[a] *Godfrey* action is
the state counterpart to a *Bivens* action. A *Bivens* action is a claim brought in federal court
against a federal agent to recover damages from the agent's commission of a Federal
constitutional tort." *Id.* (internal citation omitted) (citing *Bivens v. Six Unknown Named
Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971)). Recognition of such a
claim raised the question of whether there is some form of qualified immunity to an Iowa
constitutional claim, just as there is to a federal constitutional tort.

Here, the defendants assert, first, that they have immunity to Saunders's Iowa
constitutional claims pursuant to Iowa Code § 670.4(1). Indeed, they assert that
§ 670.4(1)(c) exempts *officers* from liability for any claim when they exercised "due care"
or were performing a "discretionary function."

Section 670.4(1), a provision of the Iowa Municipal Tort Claims Act (IMTCA), provides, in pertinent part, as follows:

> 1. The liability imposed by section 670.2 shall have no application to any claim enumerated in this section. As to any of the following claims, *a municipality* shall be liable only to the extent liability may be imposed by the express statute dealing with such claims and, in the absence of such express statute, *the municipality* shall be immune from liability:
>
> * * *
>
> > c. Any claim based upon an act or omission of an officer or employee of the municipality, *exercising due care*, in the execution of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid, *or* based upon the exercise or performance or the failure to exercise or perform *a discretionary function* or duty on the part of the municipality or an officer or employee of the municipality, whether or not the discretion is abused.

IOWA CODE § 670.4(1)(c) (emphasis added).

Contrary to the defendants' contentions, § 670.4(1)(c) provides no immunity for individual *officers* to Iowa constitutional torts. First, the plain language of the statute states that "*the municipality* shall be immune from liability" for certain acts of its officers. *Id.* (emphasis added). It says nothing at all about the immunity of the officers. Second, the Iowa Supreme Court's reading of the statute also limits it to *municipal* immunity:

> The IMTCA expressly dictates *immunities for defendant municipalities*. Iowa Code § 670.4(1); *see Jahnke v. Inc. City of Des Moines*, 191 N.W.2d 780, 782 (Iowa 1971) (noting the IMTCA eliminated any common law immunities in tort previously given to municipalities). In relevant part, *the IMTCA immunizes municipalities* against "[a]ny claim based upon an act or omission of an officer or employee of the municipality, exercising due care, in the execution of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid." Iowa Code § 670.4(1)(c). If the officers

> exercised due care in executing an ordinance, *the City would be immune* pursuant to section 670.4(1)(c).

*Baldwin V*, 929 N.W.2d at 697–98 (emphasis added). Third, to the extent the defendants rely on the "discretionary function" prong of the statute, "the discretionary function exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Anderson v. State*, 692 N.W.2d 360, 364 (Iowa 2005) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988), and noting the Iowa Supreme Court's adoption of this standard). It is not enough that the officers exercised some "choice." *Id.* Any choices the officers made, here, were not based on considerations of public policy. Fourth, the defendants have not cited, and the court has not found, any decision by an Iowa state court holding that exercising "due care" or performing a "discretionary function" exempts an individual law enforcement officer from an Iowa constitutional tort. On the other hand, as the statutory language makes clear, this statutory provision does exempt *a municipality*, such as the City, from liability if its officers exercised "due care." *Id.* at 698 ("[T]he due care exemption under section 670.4(1)(c) could provide the City immunity.").

The immunity of *individual officers* to Iowa constitutional torts is created by common law, not statute. As the Iowa Supreme Court explained,

> In [*Baldwin v. City of Estherville (Baldwin II)*, 915 N.W.2d 259 (Iowa 2018)], we answered a certified question from the federal court involving qualified immunity. 915 N.W.2d at 260–61, 281. There we said,
>
> > Constitutional torts are torts, not generally strict liability cases. Accordingly, with respect to a damage claim under article I, sections 1 and 8 [of the Iowa Constitution], a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised all due care to conform to the requirements of the law.

> *Id.* at 281.

19

*Baldwin V*, 929 N.W.2d at 694; *accord Venckus v. City of Iowa City*, 930 N.W.2d 792, 802 (Iowa 2019) ("[T]he all-due-care immunity set forth in *Baldwin [II]* is a constitutional immunity. It bars suit and damages only for constitutional claims and only when the government official proves 'that he or she exercised all due care to conform with the requirements of the law.'" (quoting *Baldwin II*, 915 N.W.2d at 260–61)). The court will call this kind of immunity "all due care immunity" or "*Baldwin* immunity." *See Venckus*, 930 N.W.2d at 802 (using both descriptions).

Unfortunately, the Iowa state courts have had little opportunity to develop the requirements of the "all due care immunity" defense. In *Baldwin v. Estherville (Baldwin III)*, 333 F. Supp. 3d 817 (N.D. Iowa 2018), however, then-District Judge Mark Bennett gleaned several considerations relevant to the defense from the Iowa Supreme Court's opinion in *Baldwin II*. First, he concluded that "the determination . . . that [the plaintiff's] rights under . . . the Iowa Constitution were violated, does not necessarily mean that he is entitled to recover damages for that violation." *Baldwin III*, 333 F. Supp. at 842 (citing *Baldwin II*, 915 N.W.2d at 278-79. The same is true under federal qualified immunity where, despite a violation of a federal constitutional right, the officer may still be entitled to qualified immunity if the right violated was not clearly established.

Second, Judge Bennett concluded that "equating 'all due care' with a 'negligence' standard appears to be appropriate." *Id.* at 842-43 (citing *Baldwin II*, 915 N.W.2d at 280). Indeed, as another decision from the Northern District of Iowa cogently observed, under the federal qualified immunity standard, "a state actor who is merely negligent, rather than being plainly incompetent or knowingly violating the law, is entitled to qualified immunity," so from the officer's perspective, the requirement to establish "all due care immunity" under Iowa law, by proving that he or she was not negligent, is more "stringent" than the federal standard. *Ohlson-Townsend v. Wolf*, No. 18-CV-4093-CJW-MAR, 2019 WL 6609695, at *8–9 (N.D. Iowa Dec. 5, 2019) (Williams, J.) (adding that, if an officer was not entitled to qualified immunity under the less stringent federal standard, then for

the same reasons, he is not entitled to qualified immunity under Iowa's "all due care" standard).

Third, "[t]he defense is not based on 'all due care,' standing alone [because] the Iowa Supreme Court stated the defense in terms of proof that the defendant 'exercised all due care *to conform to [or with] the requirements of the law*," *Baldwin III*, 333 F. Supp. 2d at 843 (citing *Baldwin II*, 915 N.W.2d at 260-61 (with), 279 (to), 281 (to)). Judge Bennet observed that, as compared to federal qualified immunity, "[t]he distinction appears . . . to be between *taking reasonable action* to 'conform' to the requirements of the law, under the Iowa 'all due care' qualified immunity standard, and *avoiding action* one should reasonably know would violate the law, under the . . . federal qualified immunity standard." *Id.*

Fourth, Judge Bennett concluded that "while 'good faith' is irrelevant to the constitutional violation, it is relevant to the issue of damages," and hence, to "all due care" immunity. *Id.* at 843-44. Fifth, and relatedly, Judge Bennett concluded that "'bad faith,' 'malice and lack of probable cause,' and lack of 'reasonable ground' for the conduct in question are factors suggesting that the 'all due care' qualified immunity defense is inapplicable." *Id.* at 845.

This court agrees with Judge Bennett's assessment of factors relevant to "all due care immunity." This court also agrees with Judge Bennett's assessment that, in the absence of genuine issues of material fact, the court should decide the question of 'all due care' qualified immunity at the summary judgment stage." *Id.* at 841; *accord Baldwin v. Estherville*, *Iowa (Baldwin IV)*, 336 F. Supp. 3d 948, 955-56 (N.D. Iowa 2018) (reiterating this conclusion);[5] *Lee v. Dawson*, No. C17-4073-LTS, 2019 WL 3068456, at *12 (N.D. Iowa July 12, 2019) (Strand, C.J.).

---

[5] According to the Iowa Supreme Court, *Baldwin I* is *Baldwin v. Estherville, Iowa*, 218 F. Supp. 3d 987 (N.D. Iowa 2016), which involved Iowa constitutional claims. *See Baldwin V*, 929 N.W.2d at 693.

This court adds what is perhaps obvious: Like federal qualified immunity, the court asks two questions when deciding whether "all due care immunity" (or "*Baldwin* immunity") is applicable. The first question is whether a defendant has violated an Iowa constitutional right. *Cf. Ivey*, 968 F.3d at 849 (stating the elements of federal qualified immunity). In the absence of a *claim* of a constitutional violation, there would be no need to address "*Baldwin* immunity." *See Venckus*, 930 N.W.2d at 802 ("[T]he all-due-care immunity set forth in *Baldwin [II]* is a constitutional immunity. It bars suit and damages only for constitutional claims."); *see also Baldwin III*, 333 F. Supp. 2d at 843-44 (separating the violation question from the immunity question by recognizing that, "while 'good faith' is irrelevant to the constitutional violation, it is relevant to the issue of damages," and hence, to "all due care" immunity). Second, if a violation has been proved—or, at summary judgment, if the plaintiff has generated a genuine issue of material fact that there was a violation—the court considers whether the officer "exercised all due care to conform to the requirements of the law." *Baldwin II*, 915 N.W.2d at 281; *cf. Ivey*, 968 F.3d at 849 (explaining that, for purposes of federal qualified immunity, if there was a violation of a federal constitutional right, the second question is "whether that right was clearly established at the time of the defendant's conduct"). If the answer to *both* questions is *yes*, then the individual defendants are *not* entitled to "*Baldwin* immunity" to an Iowa constitutional claim. Nevertheless, as with federal qualified immunity, this court concludes that courts "have the discretion to decide either question first." *Cf. id.* This is so, because if the answer to either question is *no*, that answer essentially moots the other question, and means that the individual defendants *are* entitled to "*Baldwin* immunity" and are *not* liable for damages.

### 2.    *Saunders's claims*

The court will apply the standards, above, to each claim or pair of analogous claims, in turn.

### a. The "stop, search, and seizure" claims

In Counts 1 and 2, Saunders alleges that, "[o]n July 8, 2018, Defendants . . . stop[ed] Mr. Saunders' vehicle; seiz[ed] Mr. Saunders; and search[ed] Mr. Saunders and his vehicle without reasonable suspicion or probable cause to do so." Petition, ¶¶ 77, 84. He contends that these actions violated the Fourth Amendment to the United States Constitution and Article I, § 8, of the Iowa Constitution. The court's analysis begins with the first prong of the federal qualified immunity analysis and the Iowa "*Baldwin* immunity" analysis, that is, in the context of summary judgment, whether there are genuine issues of material fact that the officers violated Saunders's rights.

As the Eighth Circuit Court of Appeals recently explained,

> The Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const. amend. IV, and a traffic stop constitutes a seizure of the vehicle's occupants, *Brendlin v. California*, 551 U.S. 249, 255, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). As such, a traffic stop must be justified by "reasonable suspicion ... that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quotation marks and citation omitted). "When an officer makes a routine traffic stop, the officer is entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (quotation marks and citation omitted).

*United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir. 2020). As to the "reasonable suspicion requirement, the court explained,

> "The concept of reasonable suspicion is somewhat abstract," but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744. Because the determination as to reasonable suspicion must be based on the "totality of the circumstances," *id*. at 273, 122 S.Ct. 744, courts may not view individual elements of suspicion in isolation. In fact, "*Terry [v. Ohio*, 392 U.S. 1

> (1968)]... precludes this sort of divide-and-conquer analysis."
> *Id*. at 274, 122 S.Ct. 744. Rather, we must view the individual
> elements in context, i.e., in light of one another, and give "due
> weight" to the officer's inferences when assessing the overall
> level of suspicion. *Ornelas [v. United States]*, 517 U.S. [690,]
> 699, 116 S.Ct. 1657 [(1996)]. As such, "[a] determination that
> reasonable suspicion exists ... need not rule out the possibility
> of innocent conduct." *Arvizu*, 534 U.S. at 277, 122 S.Ct. 744.

*Sanchez*, 955 F.3d at 674–75. Furthermore, "if in the process of questioning the individual the officer develops a reasonable suspicion or probable cause to believe that a crime is being committed by that individual, the officer may take further, reasonable action to confirm or dispel that suspicion or probable cause."  *United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019), *cert. denied*, 140 S. Ct. 1217 (2020).

Similarly, as the Iowa Supreme Court has explained,

> Article I, section 8 guarantees the right to be secure
> against unreasonable searches and seizures, and it contains
> language nearly identical to the Fourth Amendment
> counterpart. *See State v. Short*, 851 N.W.2d 474, 500–01 (Iowa
> 2014). *Compare* Iowa Const. art. I, § 8, *with* U.S. Const.
> amend. IV. "When both federal and state constitutional claims
> are raised, we may, in our discretion, choose to consider either
> claim first in order to dispose of the case, or we may consider
> both claims simultaneously." *State v. Ochoa*, 792 N.W.2d 260,
> 267 (Iowa 2010).

*State v. Salcedo*, 935 N.W.2d 572, 577 (Iowa 2019).  The Iowa Supreme Court has "determined the subjective motivations of an individual officer in making a traffic stop under article I, section 8 of the Iowa Constitution are irrelevant as long as the officer has objectively reasonable cause to believe the motorist violated a traffic law."  *State v. Haas*, 930 N.W.2d 699, 702 (Iowa 2019).  Also, under Iowa law, "'[t]he purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning.'"  *State v. Baker*, 925 N.W.2d 602, 610 (Iowa 2019) (quoting *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002)).

Here, the parties devote a great deal of energy to the question of whether the officers stopped Saunders's vehicle, as he contends, or whether no "stop" occurred until the officers approached Saunders's parked vehicle on foot, as the defendants contend. Saunders argues that the officers' actions in following him then parking in the middle of the street would have indicated to a reasonable person that they intended to make contact with him. The undisputed facts, however, show that the officers never turned on their flashing lights, emergency lights, or sirens to indicate any intent to take some action regarding Saunders and that at no point before Saunders pulled in next to the fire hydrant did the officers give any express indication that they wanted him to stop. Taking the record as a whole, the court concludes that no reasonable trier of fact could find that Saunders was "stopped" before he voluntarily parked his vehicle in front of the fire hydrant. *Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).

No "stop" of Saunders's moving vehicle is required for a constitutional claim, however. Indeed, in the seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968), the police officer walked up to two individuals standing on a street, identified himself as a police officer, and began asking them questions concerning what he had observed about their behavior in apparently "casing" certain stores for possible robbery. 392 U.S. at 6-7. Here, when the officers approached Saunders's vehicle, they had already observed that it was parked in front of a fire hydrant, which they noted was against the law. Thus, they had reasonable suspicion and reasonable cause to believe that a traffic (parking) violation had occurred. *See Sanchez*, 955 F.3d at 674-75; *Haas*, 930 N.W.2d at 702. No reasonable trier of fact could conclude otherwise. *Torgerson*, 643 F.3d at 1042-43 (summary judgment standard).

Once a lawful stop had occurred, the officers were permitted to ask Saunders questions, because additional circumstances came to their attention warranting further investigation. *See Turner*, 934 F.3d at 798; *Baker*, 925 N.W.2d at 610. Those circumstances, here, were the discovery of a child who appeared too young not to be in a booster seat and an open liquor bottle plainly visible in the backseat of Saunders's vehicle.

*See, e.g., United States v. Stephens*, 350 F.3d 778, 780 (8th Cir. 2003) (holding that officers were allowed to investigate further, when contraband became plainly visible inside a vehicle during a stop).  Furthermore, "[i]t is well settled that, 'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures.'"  *United States v. Stoltz*, 683 F.3d 934, 938 (8th Cir. 2012) (quoting *Maryland v. Wilson*, 519 U.S. 408, 412 (1997)).  Saunders has not cited any Iowa law to the contrary.  Thus, as a matter of law, investigating the possible booster seat violation and the open liquor bottle violation, as well as removing Saunders from his vehicle, did not violate a right under either the federal or the Iowa Constitution.

Also, "[a]fter a suspect is lawfully stopped, an officer may conduct a pat-down search for weapons if that officer has a reasonable, articulable suspicion that the suspect is armed and dangerous."  *United States v. Houston*, 920 F.3d 1168, 1172 (8th Cir. 2019) (citing *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015)); *United States v. Fields*, 832 F.3d 831, 835 (8th Cir. 2016).  Even if a person is cooperative, that cooperation does not negate the risk that the person may be armed and potentially dangerous.  *United States v. Fisher*, 364 F.3d 970, 973–74 (8th Cir. 2004).  Here, the officers knew, when Saunders provided his permit to carry a handgun, that he was potentially armed, and his statement that the handgun was under his seat did not negate the suspicion that he might also have a handgun on his person, so that it was reasonable for Thies to pat him down before continuing the conversation outside of the car.  Thus, as a matter of law, the pat down did not violate a right under either the federal or the Iowa Constitution.

Finally, although there is no evidence that Saunders consented to the search of the interior of his vehicle, that does not mean the search violated Saunders's federal or state constitutional rights.  This is so, because "[d]uring a lawful investigatory stop, officers may search a vehicle when they develop probable cause to believe it contains contraband or evidence of criminal activity."  *United States v. Williams*, 955 F.3d 734, 737 (8th Cir.

2020); *State v. Edgington*, 487 N.W.2d 675, 678 (Iowa 1992) ("Probable cause for a vehicle search can be established by the officers' discovery of an illegal weapon or other contraband."). Probable cause for the search of Saunders's vehicle arose from the presence of an open liquor container in his vehicle. Thus, as a matter of law, the search of his vehicle did not violate either federal or state constitutional rights.

In short, because Saunders has failed to generate genuine issues of material fact on the "violation" prong of federal qualified immunity and Iowa "*Baldwin* immunity" on these claims, the defendants' Motions For Summary Judgment are **granted** as to Saunders's "stop, search, and seizure" claims in Counts 1 and 2 of his Petition.

### b.    The "unreasonable extension" claims

In Counts 3 and 4, Saunders claims that his rights under the Fourth Amendment to the United States Constitution and Article I, § 8, of the Iowa Constitution were violated when, "[o]n July 8, 2018, Defendants . . . extend[ed] the vehicle stop beyond what was reasonably necessary to resolve the basis for the stop." Petition at ¶¶ 92, 99. Saunders argues that there was no valid, ongoing traffic stop because the purported purpose for the stop—to investigate the parking violation—was not pursued, and there are genuine issues of material fact as to whether the officers' extension of the stop well beyond the time it would have taken to resolve the parking issue was a constitutional violation.

As the Eighth Circuit Court of Appeals has explained,

> "The Fourth Amendment requires that a search not continue longer than necessary to effectuate the purposes of an investigative stop." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993). "[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates." *Id*. . . .
>
> In *Rodriguez v. United States*, the Supreme Court held that "the tolerable duration of police inquires in the traffic-stop context is determined by the seizure's 'mission.'" —— U.S. —— —, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015). In other words, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," *id*. at 1612, because a

"seizure remains lawful only so long as [unrelated] inquires do not measurably extend the duration of the stop," *id.* at 1615 (internal quotation marks omitted) (alteration in original). When conducting a traffic stop, the "mission" of stopping the vehicle is to address a traffic violation and related safety concerns. Applying this logic, the Supreme Court concluded that law enforcement cannot unlawfully extend a traffic stop to allow a drug-sniffing dog to check for narcotics after the traffic violation has already been addressed. *Id.* at 1614–15, 1616–17 (remanding to determine "whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond the completion of the traffic infraction investigation").

*United States v. Mosley*, 878 F.3d 246, 253 (8th Cir. 2017).

Even after *Rodriguez*, however, the Eighth Circuit Court of Appeals recognized the following:

If an officer encounters legitimate complications in completing these routine tasks [of a stop], the officer "may reasonably detain a driver for a longer duration than when" no such complications arise. *United States v. Olivera–Mendez*, 484 F.3d 505, 510 (8th Cir. 2007). "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002). But the officer must identify "specific and articulable facts which, taken together with rational inferences from those facts," amount to reasonable suspicion that further investigation is warranted. [*United States v. Woods*], 829 F.3d [675,] 679 [(8th Cir. 2016),] (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The totality of the circumstances are to be considered in determining whether reasonable suspicion existed. *See id.*

*United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017). Thus, a traffic stop is not unlawfully prolonged if the officer observes contents of the vehicle or seeming implausibilities and inconsistencies in the occupant's responses to officer's routine questions that give rise to reasonable suspicion. *Id.* at 416; *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016) ("An officer conducting a traffic stop who discovers

information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation."). Thus, only in the absence of reasonable suspicion are police prohibited from extending an otherwise-completed traffic stop in order to conduct further investigation. *See Woods*, 829 F.3d at 679 (citing *Rodriguez v. United States*, 535 U.S. 348, 356 (2015)). In *Rodriguez*, the Supreme Court remanded the case for determination of "whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond the completion of the traffic infraction investigation." 535 U.S. at 355, 358. The Iowa Court of Appeals has recognized similar principles under Article I, § 8, of the Iowa Constitution. *See State v. Kilpatrick*, 919 N.W.2d 768, 2018 WL 3060259, *2-*3 (Iowa Ct. App. 2018) (table op.).

Here, contrary to Saunders's contentions, the "mission" of the stop was not simply investigation of the traffic violation of parking in front of a fire hydrant. *Mosley*, 878 F.3d at 253 (explaining that, under *Rodriguez*, the investigative stop must end when the "mission" of the stop is completed). Rather, the officers quickly discovered information warranting further investigation, *Murillo-Salgado*, 854 F.3d at 416, and/or leading to reasonable suspicion of unrelated infractions, consisting of a child in the vehicle who appeared too young not to be in a booster seat and the open bottle of liquor, the latter of which warranted further investigation of whether Saunders had been drinking while driving, all of which permitted the officers to extend the stop. *Rodriguez*, 535 U.S. at 355, 358; *Woods*, 829 F.3d at 679.

That is not the end of the matter, however. This case also presents circumstances warranting submitting to a jury the question of whether the stop was improperly prolonged beyond the time reasonably necessary to resolve all three possible violations. *Cf. id.* The primary—but perhaps not the only—prolongation of the stop that a reasonable jury could find unreasonable on the record in this case, viewed in the light most favorable to Saunders, *see Torgerson*, 643 F.3d at 1042-43 (summary judgment standard), is that from the time that Saunders refused a field sobriety test and asked to "blow" until the PBT test was

requested, in the wake of a search of Saunders's car, was 2 minutes and 29 seconds. A reasonable jury could find that, had Thies been reasonably diligent, he would have called for a PBT unit promptly, but he did not. Indeed, a reasonable jury could conclude that Thies abandoned his attempt to do a sobriety test of any kind on Saunders, because Thies turned, without comment, to a search of Saunders's car. Admittedly, that search was related to Thies's suspicions arising from the open liquor bottle and whether Saunders had been drinking or was otherwise impaired, but that search need not have delayed a PBT test. Calling for an officer with a PBT unit immediately would not have delayed Thies's search but failing to do so immediately may have prolonged the stop unnecessarily.

Thus, as to these two claims, the court must consider the second prong of the analysis of federal qualified immunity and Iowa "*Baldwin* immunity." Furthermore, even if the officers have some form of immunity, at this prong of the analysis, for the reasons explained, above, the City does not. *See Ivey*, 968 F.3d at 851. This is so, because the determination of the City's liability "does not flow ineluctably from a resolution of the qualified-immunity issue," so the question of whether it is liable for failing to train its officers is not inextricably intertwined with the matter of qualified immunity. *Id.* For the same reason—that there may have been a violation of Saunders's Iowa constitutional rights, even if the officers have "*Baldwin* immunity"—the City may still be liable for failing to train its officers on that claim under Iowa law. *See Baldwin III*, 333 F. Supp. 2d at 843-44 (separating the violation question from the "*Baldwin* immunity" question by recognizing that, "while 'good faith' is irrelevant to the constitutional violation, it is relevant to the issue of damages," and hence, to "all due care" immunity).

For purposes of federal qualified immunity, it was certainly clearly established by the Supreme Court's decision in *Rodriguez*, a little over three years before the incident in this case, that officers cannot unreasonably extend or prolong a traffic stop to pursue other matters. 535 U.S. at 354-55. Nevertheless, this broad principle is at "too high a level of generality" to be determinative, here. *Ivey*, 968 F.3d at 849 (citing *Kisela*, 138 S. Ct. at

1152). Still, Saunders has not cited, and the court has not found, any decision showing that the violative nature of the particular conduct at issue, here—failure to request the assistance of another officer or equipment promptly, before conducting other tasks related to an officer's reasonable suspicions—is clearly established. *Goffin*, 957 F.3d at 861. Because a constitutional violation from this conduct is not obvious, Saunders's failure to identify a case where an officer acting under similar circumstances was held to have violated the United States Constitution is fatal to this federal claim, because the officers have federal qualified immunity. *Id*. at 861–62.

Federal qualified immunity is easier to obtain than "*Baldwin* immunity," however. *See, e.g. Ohlson-Townsend*, 2019 WL 6609695, at *8–9 (describing "all due care immunity" as a more stringent standard that federal qualified immunity). While Thies and Dee have federal qualified immunity because they *avoided action* they should reasonably have known would violate the federal Constitution, to obtain "*Baldwin* immunity," they must have *taken all reasonable action* to conform to the requirements of the Iowa Constitution. *Baldwin III*, 333 F. Supp. 2d at 843 (citing *Baldwin II*, 915 N.W.2d at 260-61 (with), 279 (to), 281 (to)). A reasonable jury could conclude that they did not do so, viewing the evidence in the light most favorable to Saunders, because Thies reasonably could have requested a PBT unit immediately when Saunders declined to take a field sobriety test and asked for a PBT, and Thies could have done so prior to the search of Saunders's vehicle. Also, "bad faith" and lack of a "reasonable ground" for the officer's action are also relevant to the "*Baldwin* immunity" analysis. *See id.* at 845. Here, a reasonable jury could conclude that Thies's apparent abandonment of any sobriety testing when it appeared inconvenient (because PBT testing provides a far more objective result than a field sobriety test) lacked a "reasonable ground." A reasonable jury could also find that Thies's decision, instead, to search the vehicle for other evidence of drinking or other impairment, which would make a sobriety test unnecessary, was in "bad faith," because only when the search failed to turn up any additional evidence did Thies request a PBT

unit.  Although the court probably would not so find, if it were the ultimate factfinder, the question of "*Baldwin* immunity" to the Iowa constitutional claim—like the question of whether there was, in fact, a violation of the Iowa Constitution—is one for the jury.

The defendants' Motions For Summary Judgment are **granted** as to Count 3 but **denied** as to Count 4.

### c.      The "pretextual stop" claim

In Count 5, Saunders alleges that, on July 8, 2018, the defendants "effectuat[ed] a pretextual warrantless automobile stop" in violation of Article I, § 8, of the Iowa Constitution.  Petition at ¶ 107.  Saunders does not assert an analogous federal claim.  In response to the defendants' Motions For Summary Judgment on this claim, however, Saunders states that he "does not resist the dismissal of Count 5."  Pl.'s Br. at 2.

Therefore, the defendants' Motions For Summary Judgment are **granted** as to Count 5.

### d.      The "equal protection" claims

Counts 6 and 7 allege racially biased policing in that the officers singled Saunders out for harassment and treated him differently from other similarly-situated persons because of his race and the color of his skin in violation of his equal protection rights under the Fourteenth Amendment to the U.S. Constitution and Article I, § 6, of the Iowa Constitution.  Petition at ¶¶ 115-16, 122-23.  Saunders argues that a detention based on race, even one otherwise authorized by law, violates the Fourteenth Amendment Equal Protection Clause.  He also contends that, unlike his "search and seizure" claims, the officers' discriminatory motive is relevant.  He points to circumstances of his stop and other stops of whites and non-whites conducted by Thies and other Des Moines Police Officers as demonstrating the required discriminatory motive.

As the Eighth Circuit Court of Appeals has explained,

> To prove an equal protection claim in the context of a police interaction, [the plaintiff] must prove that the officer exercised his discretion to enforce a law solely on the basis of

> race. *Johnson v. Crooks*, 326 F.3d 995, 999-1000 (8th Cir.
> 2003). This requires a showing of both discriminatory purpose
> and discriminatory effect. *Id.* (citing *United States v.
> Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d
> 687 (1996)). "[E]ncounters with officers may violate the Equal
> Protection Clause when initiated solely based on racial
> considerations." *United States v. Frazier*, 408 F.3d 1102, 1108
> (8th Cir. 2005) (citing *United States v. Woods*, 213 F.3d 1021,
> 1022-23 (8th Cir. 2000)). "When the claim is selective
> enforcement of the traffic laws or a racially-motivated arrest,
> the plaintiff must normally prove that similarly situated
> individuals were not stopped or arrested in order to show the
> requisite discriminatory effect and purpose." *Johnson*, 326
> F.3d at 1000 (citing *Chavez v. Ill. State Police*, 251 F.3d 612,
> 634-48 (7th Cir. 2001); *Gardenhire v. Schubert*, 205 F.3d 303,
> 319 (6th Cir. 2000)).

*Clark v. Clark*, 926 F.3d 972, 980 (8th Cir.), *cert. denied*, 140 S. Ct. 628, 205 L. Ed. 2d

388 (2019). The similarly-situated persons must be similarly situated "'in all relevant

respects.'" *Gilani v. Matthews*, 843 F.3d 342, 348 (8th Cir. 2016) (quoting *Flowers v. City

of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009)).

To show discriminatory effect, statistics must show that whites are violating the

ordinance and escaping arrest at a disproportionate rate compared to people of the

plaintiff's race. *Gilani*, 843 F.3d at 348 (citing *United States v. Armstrong*, 517 U.S. 456,

470 (1996)). As to the other element, "'[p]roving discriminatory purpose is no simple

task.'" *Id.* at 349 (quoting *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 511 (8th Cir.

2015)). The plaintiff must present "'affirmative evidence from which a jury could find that

[the plaintiff] has carried his . . . burden of proving the pertinent motive.'" *Clark*, 926 F.3d

at 980 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d

759 (1998)). In *Clark*, the court held that an officer's statement "don't play the race card

with me" may have been hostile and unprofessional, but that it did not, alone, carry the

burden of showing racial discrimination on the officer's part, and that this was particularly

so when the alleged discriminatory acts were consistent with legitimate police work. *Id.*

Saunders is correct that the Iowa Supreme Court has explained, "In the event of an unconstitutional traffic stop based on a claim of selective enforcement, the Equal Protection Clause—not the State or Federal Search and Seizure Clause—is the proper claim to bring when seeking recourse." *State v. Brown*, 930 N.W.2d 840, 850 (Iowa 2019). The parties have not suggested that an equal protection violation of the Iowa Constitution based on racially biased policing would necessarily be analyzed any differently than an analogous federal claim.

Of course, a prerequisite to racially biased policing would be the officers' knowledge of the race of the person they stopped. Here, Saunders did not allege anywhere in his statement of facts, nor has he pointed to any evidence from which a reasonable juror could infer, *see Torgerson*, 643 F.3d at 1042-43 (summary judgment standard), that Thies and/or Dee knew he was African-American at the time they started following him or, indeed, before they approached his vehicle on foot and effected a stop. Saunders alleges only that he is, in fact, a 29-year-old African-American man with long, dreadlocked hair, based on evidence from video from one of the cameras 11 minutes into the stop. *See* Pl.'s Stmt. of Facts, ¶ 1. This is even slimmer evidence to support a claim of racial discrimination than the comment found insufficient in *Clark*, 926 F.3d at 980. Thus, this claim fails as a matter of law at the outset, because if there was no evidence the officers knew Saunders's race before they effected the stop, there is no evidence of a racially discriminatory stop. *See Clark*, 926 F.3d at 980 (explaining that the plaintiff must show that the encounter was initiated solely because of the plaintiff's race). The plaintiffs are entitled to summary judgment on these claims on this ground, alone.

Also, as explained, just above, in a traffic violation case such as this, "'the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose.'" *Id.* (quoting *Johnson*, 326 F.3d at 1000). Here, however, Saunders has not offered any statistically significant evidence of discriminatory effect or purpose. Instead, he relies on anecdotal evidence of a

handful of cases in which African-Americans were stopped and one in which whites were stopped by Thies, Dee, and/or other Des Moines Police Officers, but those stops involved a variety of alleged violations and circumstances. Such evidence is insufficient as a matter of law, because Saunders has not shown the comparators are be similarly situated "'in all relevant respects.'" *Gilani*, 843 F.3d at 348 (quoting *Flowers*, 558 F.3d at 798); *see also Clark*, 926 F.3d at 980 ("'When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose.'" (quoting *Johnson*, 326 F.3d at 1000)). Although Saunders argues that the Iowa Constitution should be interpreted to provide greater protections against discrimination than the standards that applied in federal cases do, he admits that there is no clear Iowa legal precedent on an equal protection claim under the Iowa Constitution. In the absence of any such precedent, the court concludes that Saunders's Iowa equal protection claim fails for the same reasons as his federal equal protection claim.

Thus, the defendants' Motions For Summary Judgment are **granted** as to Counts 6 and 7 of Saunders's Petition.

### e. The "civil rights conspiracy" claim

In Counts 8 and 9, Saunders alleges that "Defendants Thies and Dee reached an agreement among themselves to deprive Mr. Saunders of his [federal and Iowa] constitutional rights, [respectively]," and that, "[i]n furtherance of the conspiracy, each of the coconspirators committed overt acts and was an otherwise willful participant in joint activity," in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 6 and 8 of the Iowa Constitution. Petition at ¶¶ 130-31, 137-38. The defendants contend that they are entitled to summary judgment on the conspiracy claims in the absence of any evidence of a constitutional violation. Saunders contends there is sufficient evidence of violations of his constitutional rights and of a conspiracy between Thies and Dee to deprive him of those rights.

As the Eighth Circuit Court of Appeals has explained,

> To prove a § 1983 conspiracy claim against a particular officer, [the plaintiff] must show that the officer "conspired with others to deprive [the plaintiff] of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured [the plaintiff]." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). Moreover, "the plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id.*; *see Henry v. Johnson*, 950 F.3d 1005, 1015 (8th Cir. 2020) (affirming grant of summary judgment on § 1983 civil conspiracy claim where plaintiff failed to establish a constitutional deprivation); *Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir. 1984) ("[I]t remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient. ... Without a deprivation of a constitutional right or privilege, [the defendant] has no liability under § 1983."). Therefore, where the evidence is "insufficient as a matter of law to support a finding that plaintiff suffered a constitutional deprivation as a result of the alleged conspiracy," the plaintiff's § 1983 civil conspiracy claim must fail. *Askew*, 191 F.3d at 957.

*Kingsley v. Lawrence Cty., Missouri*, 964 F.3d 690, 702–03 (8th Cir. 2020); *accord In re Kemp*, 894 F.3d 900, 910 (8th Cir. 2018) (holding that the plaintiff failed to allege a plausible constitutional violation to support a claim for civil conspiracy as required by 42 U.S.C. § 1985(3), where he failed to allege a constitutional violation), *cert. denied sub nom. Griffen v. Kemp*, 139 S. Ct. 1176 (2019); *Johnson v. Perdue*, 862 F.3d 712, 717–18 (8th Cir. 2017) ("To state a claim for conspiracy under 42 U.S.C. § 1985(3), the plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." (internal quotation marks and citation omitted)). Although the parties have not cited, and the court has not found, any Iowa state court decisions addressing an analogous claim of conspiracy to violate rights under the Iowa Constitution, there is no reason to assume that it would have any different requirements.

Here, because the court has denied summary judgment on Saunders's claim in Count 4 alleging a violation of the Iowa Constitution's search and seizure provision by prolonging the stop, there is a possible constitutional violation on which to base the conspiracy claim. *See id.* (requiring a plaintiff asserting a conspiracy claim to prove deprivation of a constitutional right). There is also sufficient evidence to present a jury question on the agreement, overt act, and injury requirements for a claim of conspiracy to violate the Iowa Constitution. *See Torgerson*, 643 F.3d at 1042-43 (summary judgment standard). On the other hand, the court granted summary judgment on all of Saunders's federal claims against these officers on the ground that there was no constitutional violation. *See Kingsley*, 964 F.3d at 702–03 (stating that the plaintiff must prove deprivation of a constitutional right to assert a civil rights conspiracy claim).

Thus, while the defendants' Motions For Summary Judgment are **granted** as to the claim of conspiracy to violate federal constitutional rights in Count 8, they are **denied** as to the claim of conspiracy to violate Iowa constitutional rights in Count 9.

### f. The "deliberate indifference" claims

In Counts 10 and 11, which are against Wingert, "individually," and the City of Des Moines, Saunders alleges that "[these] Defendants demonstrated a deliberate indifference to and/or reckless of Plaintiff's constitutional rights and those similarly situated to [him]" and that "[these] Defendants failure to train and supervise Defendants Thies and Dee caused the violations of Plaintiff's [federal and Iowa] constitutional and federal rights as set forth herein and in the other claims and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives." Petition at ¶¶ 151-52, 159-62.

Wingert and the City argue that because Thies and Dee have immunity to the constitutional violations alleged, Wingert and the City are immune, as well. They also argue that there is no basis for a "deliberate indifference" claim, where Saunders has not identified any policy of the Des Moines Police Department that is inadequate or on which

training is insufficient. They also argue that there is no evidence that any conduct by Wingert is causally related to any constitutional violation by her subordinates. Saunders counters that the record evidence shows that Thies and other Des Moines Police Officers had a pattern of targeting black motorists for unwarranted stops and expansive searches. He argues that the City and Wingert were deliberately indifferent to the need to supervise their officers, because the need for supervision is so obvious that notice is implied.

As the Eighth Circuit Court of Appeals very recently reiterated,

> The Supreme Court has held that a "pattern of similar constitutional violations" is "ordinarily necessary" to establish municipal liability, *Connick v. Thompson*, 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011), unless "the need for more or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights" that the municipality can be said to have been "deliberatively indifferent to the need," *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

*Graham v. Barnette*, No. 19-2512, 2020 WL 4744908, at *11 (8th Cir. Aug. 17, 2020). Thus, where there is no evidence of past violations, and what happened to the plaintiff is not "so obviously" the consequence of a systemic lack of training, as opposed to the decisions of individual officers, that the need for different or additional training was plain, such a claim against a municipality fails. *Id.* "In other words, because the right at issue was not clearly established, [the plaintiff] [could not] meet the 'demand that deliberate indifference in fact be deliberate.'" *Id.* (quoting *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017), and noting that decision discussed and adopted the Eighth Circuit's approach).

Similarly, as to liability of a supervisor, such as Wingert, for "deliberate indifference," "supervisors in this position are liable under § 1983 for a subordinate's violation of a third person's constitutional right only if their deliberate indifference to the offensive conduct and failure to take adequate remedial action proximately caused the injury." *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007). More specifically,

[A] supervisor

> may be held individually liable under § 1983 ... if a
> failure to properly supervise and train the offending
> employee caused a deprivation of constitutional rights.
> The plaintiff must demonstrate that the supervisor was
> deliberately indifferent to or tacitly authorized the
> offending acts. This requires a showing that the
> supervisor had notice that the training procedures and
> supervision were inadequate and likely to result in a
> constitutional violation.

> *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996)
> (internal citations omitted).

*Wever v. Lincoln Cty., Nebraska*, 388 F.3d 601, 606–07 (8th Cir. 2004). The parties have not asserted, and the court has not found, any different standard that would apply to a "deliberate indifference" claim under the Iowa Constitution.

The lack of any demonstration that Iowa law would be different matters, here, because the only claims of deprivation of constitutional rights on which the court has found there are jury questions are Iowa constitutional claims. Specifically, the claims Count 4, alleging a violation of the Iowa Constitution's search and seizure provision by prolonging the stop, and Count 9, to the extent it alleges a conspiracy to commit the violation alleged in Count 4. Thus, those are the only claims on which either the City or Wingert could be liable based on "deliberate indifference."

Here, however, there is no evidence of past violations of the right in question, and what happened to Saunders as to prolongation of the stop is not "so obviously" the consequence of a systemic lack of training, as opposed to the decisions of individual officers, that the need for different or additional training was plain. For this reason, Saunders's claim against the City fails. *Barnette*, 2020 WL 4744908, at *11. In other words, because the right at issue was not clearly established, Saunders cannot meet the demand that deliberate indifference, in fact, be deliberate. *Id.* Once again, Saunders's handful of comparator cases involved different alleged traffic violations under different

circumstances, so that they do not qualify as "past violations" comparable to the claimed "unreasonable extension" of his stop. *Id.* Similarly, as to Wingert's liability as a supervisor, Saunders has not generated any genuine issue of material fact that Wingert was deliberately indifferent to or tacitly authorized the offending act, because there is no evidence that Wingert had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation in the absence of past violations of the right in question. *Wever*, 388 F.3d at 606–07.

Therefore, the Motion For Summary Judgment by Wingert and the City is **granted** as to the "deliberate indifference" claims in Counts 10 and 11.

### B.       *The Motion To Certify Questions*

Also before the court is Saunders's June 30, 2020, Motion To Certify Question[s] To Iowa Supreme Court. The two questions that Saunders asks this court to certify to the Iowa Supreme Court are the following:

> 1.       What are the standards for a racially-biased policing claim under the Iowa Equal Protection Clause?
>
> 2.       When there is evidence showing that an officer pretextually engaged the plaintiff after considering his race, and that the officer has a pattern of illegally stopping others of the same race, must a plaintiff bringing a racially-biased policing claim under the Iowa Equal Protection Clause also produce evidence showing that similarly situated individuals of a different race were not treated the same?

Saunders explains that these questions relate to his claim in Count 7, which alleges that Thies and Dee violated his right under the Iowa equal protection clause to be free of racially biased policing.

The court granted the defendants' Motions For Summary Judgment on Count 7, above, however. Moreover, the court's first ground for summary judgment on that claim was that there was no evidence the officers knew Saunders's race, so there was no evidence of a racially discriminatory stop. That ground for summary judgment is not implicated by

Saunders's proposed certified questions, because whatever the standards for the claim under Iowa law might be, the officers' knowledge of the plaintiff's race must necessarily be one.

Therefore, Saunders's June 30, 2020, Motion To Certify Question[s] To Iowa Supreme Court is **denied**.

### III.    CONCLUSION

Upon the foregoing,

**IT IS ORDERED** that

1.      the City Defendants' April 7, 2020, Motion For Summary Judgment [Dkt. No. 17] is **granted in part and denied in part**, as follows:

      a.      the Motion is **granted** as to Counts 1, 2, 3, 5, 6, 7, 8, 10, and 11; but

      b.      the Motion is **denied** as to Count 4 and Count 9 to the extent the latter Count alleges a conspiracy to commit the violation alleged in Count 4.

2.      defendant Thies's April 20, 2020, Motion For Summary Judgment [Dkt. No. 22] is **granted in part and denied in part**, as follows:

      a.      the Motion is **granted** as to Counts 1, 2, 3, 5, 6, 7, 8, 10, and 11; but

      b.      the Motion is **denied** as to Count 4 and Count 9 to the extent the latter Count alleges a conspiracy to commit the violation alleged in Count 4.

3.      the plaintiff's June 30, 2020, Motion To Certify Question[s] To Iowa Supreme Court [Dkt. No. 37] is **denied**.

**DATED** this 8th day of September, 2020.

 

                                  _____
JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA